**FILED**

### UNITED STATES BANKRUPTCY COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

SEP 2 3 2008

CLERK U.S. BANKRUPTCY,
ORLANDO DIVISION

IN RE:

DAMIAN DIAZ and LAURA DIAZ,

　　　　Debtors.

_____/

Case No.: 6:07-bk-02364-ABB
Chapter 7

CIT SMALL BUSINESS LENDING
CORPORATION,

　　　　Plaintiff,

v.

DAMIAN DIAZ and LAURA DIAZ,

　　　　Defendants.

_____/

Adv. Pro. No.: 6:07-ap-00196-ABB

## MEMORANDUM OPINION

This matter came before the Court on the Complaint (Doc. No. 1) filed by CIT Small Business Lending Corporation, the Plaintiff herein ("Plaintiff" or "CIT"), seeking to have an alleged debt owed by Damian Diaz and Laura Diaz, a/k/a Laura Carrion, the Debtors and Defendants herein (collectively, "Debtors"), deemed nondischargeable pursuant to 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(2)(B). A final evidentiary hearing was held on July 17, 2008 at which the Debtors, a representative of the Plaintiff, and the parties' respective counsel appeared. The parties, pursuant to being granted leave, submitted closing briefs.

The Court makes the following Findings of Fact and Conclusions of Law after reviewing the pleadings and evidence, hearing live testimony and argument, and being otherwise fully advised in the premises.

## FINDINGS OF FACT

The Debtors are from Puerto Rico where they obtained college degrees. They immigrated to the United States from Puerto Rico in approximately 1983 and are United States Citizens. They were employed in Florida county positions for over twenty-five years; Mr. Diaz was employed as a road design engineer for Lake County, Florida and Mrs. Diaz was employed as a school librarian and copy clerk for Orange County, Florida.[1] Mr. Diaz served two years in the United States Army and received an honorable discharge in 1985. The Debtors speak and read English, but their English language skills are limited.

The Debtors' paramount desire was to own a small business. They had accumulated substantial savings over the years, which they intended to use for start-up costs. They, with the assistance of a business loan from the Plaintiff and the investment of all of their savings, opened an automotive repair business, Lael Auto Service Corporation, d/b/a Tilden Car Care Center ("Lael"), in early 2006.

The Debtors are unsophisticated in legal and business matters, and had no business experience prior to starting Lael. The business collapsed, causing them to seek bankruptcy protection. The Debtors filed a joint Chapter 7 bankruptcy case on June 7, 2007. They lost virtually all of their assets, including their home and an investment property (an unimproved lot), due to Lael's collapse. Their home was foreclosed and the Chapter 7 Trustee sold the investment property. The Debtors and their minor children now reside in an apartment. They were unemployed on the Petition Date and are now employed by SeaWorld earning $11.00 and $7.75 per hour.

---

[1] Pl.'s Ex. Nos. 4, 5.

The Plaintiff filed a two-count Complaint seeking the business loan in the principal amount of $326,180.66, plus accruing interest, be deemed nondischargeable pursuant to Sections 523(a)(2)(A) and 523(a)(2)(B) of the Bankruptcy Code. The Plaintiff asserts the debt arose through the Debtors' "false pretenses, false representations, and actual fraud" and materially false writings.

## Debtors' Acquisition of Auto Repair Franchise

The Debtors were interested in owning and operating a franchise business and considered automotive and Subway franchises. The Debtors engaged a broker, Goldcrest Commercial Business Consultants ("Goldcrest"), which they found through the Spanish Channel, to assist them with obtaining a franchise business. Goldcrest introduced the Debtors to Tilden Associates, Inc., Tilden for Brakes Car Care Centers ("Tilden"), a national automotive repair franchise. The Debtors turned their focus to an automotive franchise because such a franchise was less costly than other franchises.

Tilden presented the Debtors with a Single Unit Franchise Agreement in July 2005, a voluminous legal document drafted by Tilden, for the creation of a franchise relationship.[2]  Tilden, as Franchisor, and Mrs. Diaz, as Franchisee, executed the Franchise Agreement on September 29, 2005.[3]  The Franchise Agreement, among other things, required Mrs. Diaz to pay a franchise fee of $25,000.00, a royalty fee of six percent of the business' weekly gross revenues, and advertising fees. The Debtors did not have the assistance of counsel during the review and execution of the Franchise Agreement, or in any of their dealings with Tilden.

---

[2] Pl.'s Ex. No. 2 at p. 49.

[3] Pl.'s Ex. No. 2.

3

A business location had not been selected when the Franchise Agreement was executed. Tilden identified S&S Automotive, Inc. ("S&S"), a non-Tilden franchise located at 1918 South Orange Blossom Trail, Apopka, Florida 32703 ("Premises"), which was selling its automotive service business, as a potential business location. S&S had a lucrative towing business at the same location, Sands Towing, Inc., but the towing business was not for sale. Tilden introduced the Debtors to S&S. Goldcrest provided S&S' sale information to the Debtors and was involved throughout the franchising process.[4]

The Debtors, relying upon S&S' financial statements, particularly cash flow statements, and with Tilden's and Goldcrest's guidance, decided to purchase S&S' automotive repair business. S&S, as Seller, and Mr. Diaz, as Buyer, executed a Business Brokers of Florida Standard Asset Purchase Contract and Receipt on November 16, 2005 ("S&S Sale Contract") for the sale of certain assets of S&S for $300,000.00.[5] The assets included furniture, fixtures and equipment delineated in Schedule A of the S&S Sale Contract, inventory, and business records.[6]   Schedule A lists numerous items of automotive repair equipment and identifies several of the items by serial number. Accounts receivable were not included in the sale.

Goldcrest was the broker of the sale, representing both the seller and the buyer, and escrow agent. The S&S Sale Contract required the payment of $100,000.00 to Goldcrest as escrow agent at closing. The balance of $200,000.00 was to be paid to S&S pursuant to a promissory note.

---

[4] Pl.'s Ex. No. 24.
[5] Pl.'s Ex. No. 22.
[6] Pl.'s Ex. No. 22.

4

The Debtors formed Lael in December 2005 as the corporate entity conducting the Tilden franchise business. The Debtors each held a fifty-percent shareholder interest in Lael and Mrs. Diaz was named President to create minority benefits eligibility.

S&S did not own the Premises, but was leasing the Premises pursuant to a commercial lease. Lael and Mr. Diaz, jointly and severally as the tenant of the Premises, and Mr. Diaz as a personal guarantor, executed a Lease with the landlord on January 19, 2006.[7] The President of Tilden executed the Lease pursuant to a Joinder provision.

The S&S sale was consummated on January 23, 2006.[8] The Debtors were not assisted by counsel in the S&S sale. The Debtors paid the $100,000.00 required at closing from their savings and executed a number of documents. Mr. Diaz assigned the S&S Sale Contract to Lael.[9] Mrs. Diaz, as President of Lael, executed a Promissory Note in favor of S&S, which the Debtors personally guaranteed.[10] Mrs. Diaz, as President, executed a Security Agreement securing the Promissory Note and granting S&S a blanket security interest in virtually all of Lael's assets, including the assets purchased pursuant to the S&S Sale Contract.[11] The Security Agreement was recorded in the Official Records of Orange County, Florida on January 25, 2006.

The Debtors took possession of the Premises and the assets transferred pursuant to the S&S Sale Contract, including the Schedule A assets. They left their Lake County and Orlando County positions and worked full-time operating Lael's automotive business. They quickly discovered the business was not generating the level of income S&S' financial statements reflected. Mr. Diaz explained the diminished income was the result

---

[7] Pl.'s Ex. No. 3.
[8] Pl.'s Ex. Nos. 22, 23, 25.
[9] Pl.'s Ex. No. 22.
[10] Id.
[11] Id.

5

of not having a towing business, which had fed S&S' repair business. The Debtors, in an attempt to make Lael viable, advertised, acquired a tow truck, and started a towing business.

The Debtors struggled for over a year to build Lael's business and closed the business when it became apparent their efforts were in vain. They made payments to the business' creditors during its operation. They made monthly payments of $2,056.76 on the S&S loan from January 2006 through March 2007. S&S filed a proof of claim in the Debtors' bankruptcy case (Claim No. 9) asserting a claim of $186,089.00 consisting of an unsecured portion of $161,089.00 and a secured portion of $25,000.00 representing the value of the Security Agreement collateral.

### *CIT Loan*

Tilden introduced the Debtors to S&S. It knew about the S&S sale and was actively involved throughout the sale transaction. Tilden suggested the Debtors finance the $200,000.00 S&S sale balance through a loan from CIT. Tilden and CIT had a pre-existing business relationship in which CIT provided loans for other Tilden franchisees. A Tilden employee, Ed Novetti from Tilden's New York office, referred the Debtors to CIT. Tilden, concurrently with the S&S sale transaction, facilitated a loan transaction between the Debtors and CIT.

Tilden prepared and submitted to CIT "A Business Plan and Loan Request" with supporting documents ("Loan Request") requesting a loan of $345,000.00 from CIT for "the initial set up costs" of the Tilden franchise, which would "be fully collateralized by the business."[12] The Loan Request is undated, but sets forth the address of the Premises as the business location, establishing the document was created after November 16, 2005

---

[12] Pl.'s Ex. No. 1.

6

when the S&S Sale Contract was executed establishing the Premises as the franchise location.

The Loan Request contains financial projections for the franchise business which were created by Tilden. The Debtors provided no input for the Loan Request and did not sign the document.

Tilden, through telephone calls with the Debtors, discussed CIT's loan terms and requested personal information from them. The Debtors executed CIT Owner Information Forms dated December 28, 2005 ("Forms") detailing their educational and employment backgrounds and financial standing.[13] The Forms set forth the Debtors had cash assets of $150,000.00.

The Forms were submitted to CIT. The Debtors executed an undated and substantially uncompleted CIT Business Loan Application.[14] The Loan Application contains eight sections of which only two sections (Project Summary and Ownership) were completed. The handwriting on the Loan Application is the same handwriting appearing on the Forms. It is unknown who filled in the information on the Forms and the Loan Application. The Debtors did not prepare or complete any of the loan documents, including the Forms; all documents were prepared and presented to them by Tilden or CIT.

CIT received the Forms and the Loan Application. A CIT employee prepared on January 5, 2006 a Request for Credit Approval, utilizing information provided by Tilden,

---

[13] Pl.'s Ex. Nos. 4, 5.
[14] Pl.'s Ex. No. 13.

7

for a loan of $350,000.00 with loan proceeds of $261,000.00 to be used "for turnkey operation." [15] The Short Version Start-up Write-up attached to the Request states:

> The proposed loan is for the startup financing of a Tilden Car Care Center (a Tier 1 Franchise) located in Apopka, Florida owned by Damian and Laura Carrion with a target opening date of 2/1/2006. Please note that the location is currently operational and was a local repair shop that the Tilden brand bought. The location does not yet operate as a conventional Tilden franchise.
> . . .
> The location is an existing auto repair shop that was sold to the Tilden Franchise in an asset purchase . . . As part of the buyout, the previous owner agreed not to compete with the Tilden [Franchise] but will continue to operate his towing operation . . . . [16]

The Request was approved by three CIT employees on January 10 and January 12, 2006.

CIT prepared and presented to the Debtors a "conditional commitment letter" dated January 13, 2006 and a SBA Application for Business Loan.[17] CIT conditionally approved a $350,000.00 loan payable over nine years subject to the Debtors' execution of the conditional commitment letter and the SBA's agreement to guarantee the loan in an amount of at least $262,500.00 (75% of the loan). CIT required: (i) a second priority mortgage on the Debtors' home; (ii) a first priority security interest in all of Lael's assets to collateralize the loan; (iii) an assignment of Mr. Diaz' life insurance policy in the amount of $350,000.00; and (iv) payment of SBA's $7,875.00 guarantee fee.

The conditional commitment letter set forth $195,000.00 of the loan proceeds were to be utilized for equipment purchase, $40,000.00 for inventory, $26,000.00 for signage, and $89,000.00 for working capital.[18]

---

[15] Pl.'s Ex. No. 21.
[16] Pl.'s Ex. No. 21 at ¶¶ a., 2.
[17] Pl.'s Ex. No. 6.
[18] Id.

8

The Debtors executed the conditional commitment letter, the SBA Application for Business Loan, and an undated spreadsheet setting forth projected income and expenses for Lael.[19] They did not prepare the spreadsheet or provide any input for the document.

The SBA approved the $350,000.00 CIT loan on February 17, 2006 and agreed to guarantee seventy-five percent of the loan.[20] CIT approved the loan. Tilden, by a letter dated January 20, 2006, had previously approved the CIT loan.[21] The closing of the loan was conducted via mail. CIT prepared the closing documents and sent the documents to a title agent, who apparently forwarded the closing packet to the Debtors.

The Debtors received a large packet of documents by mail in late February 2006. Mrs. Diaz, as the President of Lael, executed various documents dated February 23, 2006:

(i)     SBA Loan Agreement.[22]

(ii)    Borrower's Certification certifying, among other things, "there has been no adverse change in Borrower's (and Operating Company) financial condition, organization, operations or fixed assets since the date the Loan application was signed."[23]

(iii)   SBA Note in the amount of $350,000.00 with interest of prime plus 2.750%.

(iv)    SBA Security Agreement granting CIT a security interest in virtually all of Lael's assets.

(v)     SBA Settlement Sheet.[24]

Vincenza Viera executed the Settlement Sheet as CIT's "Loan Closer."[25] The Debtors executed Unconditional Guarantees pursuant to which they individually guaranteed the

---

[19] Pl.'s Ex. No. 7.
[20] Pl.'s Ex. No. 8.
[21] Pl.'s Ex. No. 2.
[22] Pl.'s Ex. No. 8 (see pp. 11-12).
[23] Id. at p. 13.
[24] Pl.'s Ex. Nos. 9, 10, 14.

CIT note and an Affidavit stating Lael and Mrs. Diaz had had "no unremedied adverse changes" in their financial condition since the submission of the loan application.[26] CIT received the executed documents.

The Debtors received by mail a separate package containing documents relating to the granting of a second priority mortgage on their home to CIT with a note directing them to execute the documents in the presence of a notary. They took the documents to a notary's office, executed the documents, and returned the executed documents to CIT.

The Debtors had no assistance in reviewing the closing documents and were provided no instructions by CIT or Tilden. The Debtors did not read any of the documents they signed because, as Mr. Diaz explained, "they trusted" Tilden and CIT.

Tilden acted as CIT's agent throughout the CIT loan process. Virtually all communications were through Tilden, with the exception of three or four brief telephone calls between the Debtors and a CIT representative. They had no other communications with CIT, including in-person contact. CIT explained it was CIT's normal business procedure to not meet with the borrower given the small loan size.

### *CIT Loan Proceeds*

The Settlement Sheet sets forth the loan proceeds were to be disbursed as follows:

- (i) $9,773.00 to CIT for closing fees;
- (ii) $3,121.60 to First American National Lenders Advantage for title work;
- (iii) $76,105.40 to Lael for working capital;
- (iv) $26,000.00 to Tilden for leasehold improvements;
- (v) $40,000.00 to Tilden for inventory; and
- (vi) $195,000.00 to Tilden for machinery/equipment.[27]

---

[25] Pl.'s Ex. No. 14.

[26] Pl.'s Ex. Nos. 11, 12, 19.

[27] Pl.'s Ex. No. 14.

CIT issued three checks dated February 23, 2006 made payable jointly to Lael and Tilden: (i) check number 691-0028688 for $195,000.00; (ii) check number 691-0028689 for $26,000.00; and (iii) check number 691-0028687 for $40,000.00.[28]

The Debtors received the three checks and Mr. Diaz immediately telephoned his Tilden contact, Mr. Novetti, asking him for instructions. Mr. Novetti instructed Mr. Diaz to endorse the checks and send them to Tilden. Mr. Diaz endorsed each check "Lael Auto Service Corp" and "Damian Diaz" and sent the checks to Tilden.[29] Tilden endorsed each check "Tilden Equipment" and negotiated the checks at Bank of America, N.A. on March 2, 2006.[30]

Tilden retained $34,842.85 from the three CIT checks and sent the balance of $226,157.15 to Mr. Diaz via check number 1100 dated March 7, 2006.[31] The check names "Tilden Equipment" as the account holder, is handwritten, and contains no notation in the "for" line. Mr. Diaz endorsed the check "Damian Diaz" and deposited it into his personal checking account on or about March 15, 2006.[32]

Mr. Diaz explained he deposited the check into his personal account rather than Lael's business account because his personal account is an interest-bearing account. The intended purpose of the $226,157.15 was to pay off the S&S Sale Contract balance. The Debtors used the $226,157.15 for business operations, including the Debtors' weekly salaries. Mr. Diaz was paid approximately $800.00 per week. The Debtors made timely loan payments to CIT for approximately one year until they closed the business. They did not seek additional financing from CIT or any other lender.

---

[28] Id.
[29] Pl.'s Ex. No. 14.
[30] Id.
[31] Pl.'s Ex. No. 18.
[32] Id.

11

## *Tilden Equipment Invoices*

CIT's disbursement amounts of \$195,000.00 for machinery/equipment, \$40,000.00 for inventory, and \$26,000.00 for leasehold improvements contained in the Settlement Sheet were based upon three invoices prepared and presented by Tilden on Tilden letterhead.[33]  Invoice No. 0230106 dated February 15, 2006 lists nineteen items of automotive repair equipment with a total charge of \$195,000.00. The equipment is the same equipment transferred by S&S to Lael pursuant to the S&S Sale Contract. Invoice No. 021306 dated February 13, 2006 is for "Tilden Inventory Package Inc. Exhaust" with a charge of \$40,000.00.     Invoice No. 04698706 dated February 16, 2006 is for "Proprietary Tilden Sign Package" with a charge of \$26,000.00. The invoices direct payment was to be remitted to Tilden at its New York address.

Tilden created and presented these invoices to CIT *after* the S&S sale had been consummated. It knew the equipment and inventory listed in the invoices was the same equipment and inventory transferred by S&S to Lael pursuant the S&S Sale Contract. Tilden never owned or controlled the equipment and inventory. The Debtors did not participate in the preparation of the invoices nor had any knowledge of the invoices.

Mr. Diaz and Raymond Cantwell, CIT's Vice President and chief of the underwriting department, were CIT's only witnesses. The CIT representative had only a general knowledge of the CIT loan transaction with the Debtors and could not explain why the invoices were prepared. No Tilden representatives were called as witnesses. Mr. Diaz' testimony was credible. Mrs. Diaz was not called as a witness.

---

[33] Pl.'s Ex. Nos. 15, 16.

12

### *Plaintiff's Nondischargeability Allegations*

CIT asserts it was defrauded by the Debtors through false representations and

false writings, upon which it relied to its detriment. It contends the Debtors:

(i)     failed to disclose the S&S sale, which materially and adversely changed the Debtors' financial standing;

(ii)    falsely certified there had been no adverse changes in their financial standing;

(iii)   submitted materially false financial statements;

(iv)    represented they would obtain the equipment through Tilden and failed to purchase such equipment through Tilden;

(v)     misappropriated the CIT loan proceeds, which were to be used for the equipment and inventory acquisition;

(vi)    prevented CIT from obtaining a first priority security interest in the equipment; and

(vii)   submitted fraudulent invoices to CIT for equipment and inventory.

A plaintiff's burden of proof in a nondischargeability action is substantial. CIT

must establish by a preponderance of the evidence regarding Count I: (i) the Debtors

made a false representation to deceive CIT; (ii) CIT relied on the misrepresentation; (iii)

the reliance was justified; and (iv) CIT sustained a loss as a result of the

misrepresentation.

CIT, to prevail on Count II, must establish the Debtors used a written statement:

(i) that is materially false; (ii) respecting the Debtors' or an insider's financial condition;

(iii) on which the Plaintiff reasonably relied; (iv) the Debtors caused to be made or

published with intent to deceive; and (v) CIT sustained damages as a result of such

actions by the Debtors.

13

CIT failed to establish any of its allegations. CIT's own documents refute its allegations and establish the dischargeability of the alleged CIT loan debt.

The Debtors did not fail to disclose the S&S sale. Tilden, CIT's agent, knew of the S&S sale and was involved in the sale from its inception to its consummation. CIT knew of the sale *before* it approved the Debtors' business loan. CIT's Request for Credit Approval, prepared by CIT employee Ron Krauskopf on January 5, 2006, described the "turnkey operation" located at the Premises and "*owned by Damian and Laura Carrion.*"[34] "The location is an existing auto repair shop *that was sold to the Tilden Franchise in an asset purchase.*"[35] Three CIT employees subsequently approved the loan.

The Debtors did not falsely certify in the CIT loan documents there had been no adverse changes in their financial standing. The S&S sale could not have materially and adversely changed the Debtors' financial standing. CIT knew before it approved the loan the Debtors had purchased the turnkey operation and intended to open the Tilden franchise at the Premises in February 2006. The Debtors did everything they were required to do in opening and operating a Tilden franchise. They executed the Tilden franchise agreement, found an acceptable business location with Tilden's assistance, purchased the S&S business, consummated the sale pursuant to the S&S Sale Contract which included purchasing the equipment and inventory, and operated Lael's business at the Premises.

The Debtors made no false statements as to their financial standing and possessed no intent to commit fraud upon CIT. The Owner Information Forms submitted to CIT

---

[34] Pl.'s Ex. No. 21, pp. 1, 3 ¶a (*emphasis added*).

[35] Pl.'s Ex. No. 21, p. 4 ¶2.

14

and signed by the Debtors on December 28, 2005 were accurate. The S&S sale had not been consummated and the Debtors continued to hold their cash savings. They had not yet acquired S&S' equipment and inventory.

To the extent any documents submitted to CIT after consummation of the S&S sale do not reflect the sums paid by the Debtors from their savings to S&S and their acquisition of S&S' equipment and inventory, such discrepancy was not caused by the Debtors. They did not draft the documents; Tilden and/or CIT prepared all of the documents relating to the CIT loan. The Debtors signed each document they were called upon to sign, but did not read the documents because they trusted CIT and Tilden. The Debtors' failure to read the documents was naïve, but not reckless or deceitful. The Debtors did not act at any time with bad intent.

CIT asserts it relied upon the loan documents executed by the Debtors and such reliance was justifiable and reasonable. It contends it would not have approved the loan had it known of the S&S sale. CIT, as discussed above, did have knowledge of the S&S sale prior to approving the loan. CIT's contention it approved the loan based on deficient disclosures by the Debtors is without merit.

Any reliance CIT placed on the loan documents was neither justifiable nor reasonable, particularly given CIT's high level of business sophistication. The CIT Business Loan Application is undated and incomplete.[36] Despite these deficiencies CIT approved the loan. CIT relied on information provided by Tilden. It conducted no due diligence of the Debtors during the loan process, with the exception of a few brief telephone calls to the Debtors. No CIT representative met with the Debtors, even during

---

[36] Pl.'s Ex. No. 13.

the closing, which was conducted by mail. CIT provided no instructions or explanations of loan provisions to the Debtors.

CIT's allegations the Debtors falsely represented they would obtain Lael's equipment through Tilden and submitted fraudulent equipment invoices are without merit. No one instructed the Debtors they were to obtain equipment through Tilden. None of the loan documents required the Debtors to obtain equipment and inventory from Tilden.[37] CIT's documents repeatedly refer to the business located at the Premises as a "turnkey" business, denoting all of the items necessary to start Lael's business were already in place at the Premises. The Debtors purchased S&S' equipment and inventory pursuant to the S&S Sale Contract and utilized the equipment and inventory in Lael's business. They made no false representations regarding the acquisition of Lael's equipment and inventory.

Tilden created and presented to CIT, without the Debtors' involvement or knowledge, the invoices listing the equipment and inventory transferred to Lael in the S&S sale.[38] Tilden knew it was not supplying the equipment and inventory for Lael's business, but represented in the invoices it was the supplier. Tilden issued the invoices weeks after the S&S sale had been consummated knowing the Debtors had acquired the equipment and inventory from S&S. Any issues regarding fraudulent misrepresentations concerning the equipment and inventory are between CIT and Tilden.

CIT's allegation the Debtors misappropriated the CIT loan proceeds is without merit. Mr. Diaz, upon receipt of the CIT checks made jointly payable to him and Tilden,

---

[37] *See, e.g.,* Pl.'s Ex. No. 10. The Security Agreement does not provide for the source of Lael's assets and describes the collateral as "equipment," "fixtures," "inventory," "accounts," "instruments," "chattel paper," "general intangibles," "documents," and "deposit accounts."

[38] Pl.'s Ex. Nos. 15, 16.

16

immediately called the Tilden representative for instruction. The Tilden representative

directed Mr. Diaz to endorse the checks and send them to Tilden. Mr. Diaz complied.

Tilden, after depositing the CIT checks and deducting $34,842.85, transmitted a check for

$226,157.15 to Mr. Diaz. The Debtors utilized all of the funds received from Tilden in

operating Lael's business. CIT's representative could not explain why the checks were

made jointly payable to Mr. Diaz individually and not to Lael.

CIT contends the Debtors impermissibly used CIT loan proceeds to pay

themselves salaries. CIT knew Mr. Diaz would be working full-time as Lael's manager

and approved his salary pursuant to CIT's Request for Credit Approval:

### 12. Has sufficient owners draw been accounted for (Minimum officer salary of $25,000.00)?

Yes, Damian Diaz will draw a salary of $88,000 in the first year of
operations . . . Assuming a tax bracket of 28%, the borrower's take-home
household income will equal approximately $63,936.00[39]

Mrs. Diaz, as the President of Lael, would have been entitled to an owner's draw

pursuant to Paragraph 12 of CIT's Request for Credit Approval.

CIT asserts it suffered damages due to the Debtors' alleged bad acts, namely the

Debtors prevented CIT from obtaining a first priority security interest in the equipment.

The Debtors did not understand the provisions of CIT's loan documents regarding the

granting of CIT a first-priority security interest in Lael's assets. They had no intent to

deprive CIT of such a security interest. They purchased Lael's equipment and inventory

from S&S pursuant to the S&S Sale Contract and did all that had been requested of them

by S&S, Tilden, and CIT.

---

[39] Pl.'s Ex. No. 21 at p. 3 ¶1 ("Damian Diaz will be the shop's full time manager and will mainly be responsible for the operations and sales of the business."); p. 8 of Short Version Start-up Write-up.

CIT did not establish S&S holds a first priority security interest in Lael's equipment and inventory to CIT's detriment. CIT filed a UCC Financing Statement in the Florida Transaction Registry *on January 24, 2006* asserting a blanket security interest in Lael's assets.[40]  The Financing Statement reflects an irregularity regarding the CIT loan transaction. The filing of the Financing Statement predates the Debtors' acceptance and execution of the CIT loan documents. CIT had no authority to file the Financing Statement on January 24, 2006.

CIT's filing of the Financing Statement also predates S&S' filing of its Security Agreement in the Orange County Registry. CIT did not establish its Financing Statement filing complies with Florida statutory law governing the creation and perfection of security interests. CIT did not establish whether it or S&S holds a perfected security interest in Lael's assets. CIT did not establish the priority of any perfected security interests that it and S&S may hold in Lael's assets.

CIT did not establish it has incurred any other damages, including monetary damages, resulting from the Debtors' alleged bad acts. CIT presented a computer printout titled "Buyout Quote Input" setting forth it was allegedly owed $335,050.78 on May 18, 2007.[41]  The Debtors made regular payments on the CIT loan while Lael was operating. CIT recovered on its loan through the foreclosure of the Debtors' home and pursuing its SBA's seventy-five percent loan guaranty. The Buyout Quote Input does not reflect the Debtors' loan payments or amounts recovered. CIT did not produce an accounting setting forth the loan payments and recovery amounts.

---

[40] Pl.'s Ex. No. 10.
[41] Pl.'s Ex. No. 20.

CIT did not establish any of the nondischargeability elements of Section 523(a)(2)(A) or Section 523(a)(2)(B) of the Bankruptcy Code. The alleged indebtedness owed by the Debtors to CIT is dischargeable and due to be discharged.

## *Debtors' Ore Tenus Motion*

The Debtors made an *ore tenus* motion at the conclusion of the trial for an award of their attorney's fees and costs pursuant to Section 523(d) of the Bankruptcy Code. Section 523(d) allows a debtor to recover its costs, including reasonable attorney's fees, where the dischargeability action involves a consumer debt and the position of the creditor was not substantially justified. The alleged CIT loan balance debt is a business debt, not a consumer debt. The Debtors are not entitled to recovery of their costs pursuant to Section 523(d).

The Debtors are entitled to recovery of their attorney's fees and costs pursuant to Florida statutory and controlling case law. Florida Statute Section 57.105(7) provides for the recovery of costs by a prevailing party where the debt at issue arises from a contract and the contract contains an attorney's fee award provision for enforcement of the contract.. Section 57.105(7) is applicable to bankruptcy dischargeability actions.

The Plaintiff's loan documents set forth it is entitled to assess and recover costs, including attorneys' fees, for enforcement of the loan terms. Paragraph 6 of the Note provides:

Without notice and without Borrower's consent, Lender may:
. . .

B. Incur expenses to collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If Lender incurs such expenses, it may demand immediate repayment from Borrower or add the expenses to the principal balance.[42]

The Unconditional Guarantees executed by the Debtors provide at Paragraph 9:

A. ENFORCEMENT EXPENSES: Guarantor promises to pay all expenses Lender incurs to enforce this Guarantee, including, but not limited to attorney's fees and costs.[43]

The applicable federal and Florida State laws of Lael's location govern the loan.[44]

The Debtors, as the prevailing parties in this proceeding, are entitled to an award

of reasonable attorney's fees pursuant to Florida Statute Section 57.105(7). The Debtors'

*ore tenus* motion is due to be granted.

## CONCLUSIONS OF LAW

The party objecting to the dischargeability of a debt has the burden of proof and

the standard of proof is preponderance of the evidence. Grogan v. Garner, 498 U.S. 279,

291 (1991). Exceptions to discharge "should be strictly construed against the creditor

and liberally in favor of the debtor." Schweig v. Hunter (In re Hunter), 780 F.2d 1577,

1579 (11th Cir. 1986).

CIT asserts the alleged loan balance should be excepted from discharge pursuant

to 11 U.S.C. Sections 523(a)(2)(A) and 523(a)(2)(B).

---

[42] Pl.'s Ex. No. 9 at ¶6.
[43] Pl.'s Ex. Nos. 11, 12.
[44] Pl.'s Exh. No. 10 at ¶11.

## *11 U.S.C. § 523(a)(2)(A)*

Section 523(a)(2)(A) provides a discharge pursuant to Section 727 does not discharge an individual from any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—"

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A) (2007).

A plaintiff must establish the traditional elements of common law fraud to prevail in a Section 523(a)(2)(A) action. SEC v. Bilzerian (In re Bilzerian), 153 F.3d 1278, 1281 (11th Cir. 1998). A plaintiff must establish: (i) the debtor made a false representation to deceive the creditor; (ii) the creditor relied on the misrepresentation; (iii) the reliance was justified; and (iv) the creditor sustained a loss as a result of the misrepresentation. Id.; Fuller v. Johannessen (In re Johannessen), 76 F.3d 347, 350 (11th Cir. 1996). The objecting party must establish each of the four elements of fraud by a preponderance of the evidence. Grogan, 498 U.S. at 291; In re Wiggins, 250 B.R. 131, 134 (Bankr. M.D. Fla. 2000).

The cornerstone element in a Section 523(a)(2)(A) nondischargeability proceeding is a misrepresentation made with the intent to deceive the creditor. A determination of fraudulent intent is an issue of fact and "depends largely upon an assessment of the credibility and demeanor of the debtor . . . ." Equitable Bank v. Miller (In re Miller), 39 F.3d 301, 305 (11th Cir. 1994).

A creditor cannot establish non-dischargeability pursuant to Section 523(a)(2)(A) without proof of reliance on intentional misstatements by the debtor. City Bank & Trust Co. v. Vann (In re Vann), 67 F.3d 277, 280 (11th Cir. 1995). The reliance upon the

debtor's false representation must be justified. Field v. Mans, 516 U.S. 59, 73-75 (1995) (establishing Section 523(a)(2)(A) requires justifiable reliance rather than the former standard of reasonable reliance); In re Vann, 67 F.3d at 283-84 (adopting "justifiable reliance" as the applicable standard of reliance).

Whether such reliance was justified is determined by a subjective test. Id. at 281. "Justifiable reliance is gauged by an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." Id. (*quoting* W. PAGE KEETON, PROSSER & KEETON ON TORTS § 108, at 751 (5th ed. 1984)). A plaintiff must establish a causal link between the debtor's misrepresentation and the resulting loss sustained by the plaintiff. Lightner v. Lohn, 274 B.R. 545, 550 (M.D. Fla. 2002).

CIT did not establish any of the elements of Section 523(a)(2)(A). It did not establish the Debtors made any false representations to deceive CIT. The Debtors made no false representations either in writing or in any other manner. They, at no time during the CIT loan transaction, acted with bad intent. There were no misrepresentations by the Debtors upon which CIT relied. Any reliance CIT placed on statements contained in the loan documents was not justified.

CIT did not establish it sustained a loss, monetary or otherwise, as a result of any misrepresentation by the Debtors. CIT did not establish any loan balance exists. The Florida Uniform Commercial Code governs the creation and perfection of security interests. FLA. STAT. §§ 679.101, *et seq.* CIT did not establish whether it holds a perfected security interest in Lael's assets or the priority of such an interest.

### *11 U.S.C. § 523(a)(2)(B)*

CIT contends in Count II the loan balance constitutes a non-dischargeable debt

pursuant to 11 U.S.C Section 523(a)(2)(B), which excepts a debt for money, property,

services, or an extension, renewal, or refinancing of credit, to the extent obtained by:

(B) use of a statement in writing—

- (i)     that is materially false;
- (ii)    respecting the debtor's or an insider's financial condition;
- (iii)   on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
- (iv)    that the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B) (2007). An objecting creditor must also establish causation--

that it sustained a loss as a result of the representation, which is an implied element of

Section 523(a)(2)(B). Collins v. Palm Beach Sav. & Loan (In re Collins), 946 F.2d 815,

816 (11th Cir. 1991). The debt is dischargeable if any one of the elements is not

established. In re Miller, 39 F.3d at 304.

The element of "intent to deceive" is an issue of fact, which turns "largely upon

an assessment of the credibility and demeanor of the debtor . . . ." Id. at 305. A review

of the totality of the circumstances is relevant in determining a debtor's intent. Id.

CIT did not establish any of the elements of Section 523(a)(2)(B). It did not

establish the Debtors obtained the CIT loan through a writing respecting their financial

condition that was materially false. The Debtors made no false statements in the loan

documents or to CIT. CIT did not establish, to the extent it relied on the loan documents

in granting the loan, such reliance was reasonable. CIT did not establish the Debtors

made false statements which they caused to be made or published with the intent to

23

deceive. CIT did not establish it sustained a loss as a result of any misrepresentation by the Debtors.

CIT did not establish the alleged loan balance owed to CIT by the Debtors is nondischargeable pursuant to 11 U.S.C. Section 523(a)(2)(A) or Section 523(a)(2)(B). The alleged debt owed to CIT by the Debtors is dischargeable and due to be discharged.

### *Debtors' Ore Tenus Motion*

The Debtors seek, through their *ore tenus* motion, an award of fees and costs pursuant to 11 U.S.C. Section 523(d). A litigant may recover attorney's fees and costs only where such an award is provided for by enforceable contract or statute. Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 257 (1975). Section 523(d) provides:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment in favor of the debtor the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d). The alleged CIT loan debt is a business debt incurred for the Debtors' automotive business. It is not a consumer debt. The Debtors are not entitled to a recovery of fees and costs pursuant to 11 U.S.C. Section 523(d).

The Debtors are entitled to recovery of their reasonable attorney's fees incurred in this proceeding pursuant to Florida Statute Section 57.105(7). Section 57.105(7) allows for the recovery of reasonable attorney's fees by a prevailing party where there is an underlying contract containing an attorney's fee award provision for enforcement of the contract:

24

(7) If a contract contains a provision allowing attorney's fees to a party when he or she is required to take any action to enforce the contract, the court may also allow reasonable attorney's fees to the other party when that party prevails in any action, whether as plaintiff or defendant, with respect to the contract. This subsection applies to any contract entered into on or after October 1, 1988.

FLA. STAT. § 57.105(7) (2003). Section 57.105(7) is applicable in dischargeability actions and "safeguards a debtor's fresh start." In re Woollacott, 211 B.R. 83, 87 (Bankr. M.D. Fla. 1997).[45]

The alleged debt at issue arises from the CIT loan documents executed by the Debtors. The loan documents contain provisions allowing CIT its attorney's fees and costs incurred in enforcing the loan terms. The Debtors, as the prevailing parties in this adversary proceeding, are entitled to an award of their reasonable attorney's fees pursuant to Florida Statute Section 57.105(7). Id. The Debtors' Motion is due to be granted.

### *Conclusion*

The Debtors are hard-working honest people who came to the United States to make a better life for themselves and their children. Their dream was to own a business and they worked for years steadily building a nest egg to fulfill that dream.

The Debtors believed their dream was finally a reality when they obtained a Tilden franchise and opened the automotive repair facility. Their business was destined to fail from its inception despite the Debtors' investment of all of their savings, time, energies, and collateral pledges. The persons and entities the Debtors relied on to help them create a viable business took advantage of them. S&S, Tilden, and CIT disserved the Debtors by structuring a one-sided business transactions to create a business that could never be viable and a loan commitment that could never be met.

---

[45] Florida Statute Section 57.105(7) was formerly Section 57.105(2) and was renumbered by the 2003 legislative amendments.

25

The business meant everything to the Debtors, but was inconsequential to CIT. CIT did not meet with the Debtors and had only nominal telephone contact with them. It utilized Tilden to carry out the loan process. CIT did not conduct a face to face closing because it considered the loan amount too small to warrant an actual closing. The Debtors did all they were required to do by S&S, Tilden, and CIT and they lost everything as a result.

Accordingly, it is

**ORDERED, ADJUDGED and DECREED** that the Debtors' *ore tenus* motion for an award of fees and costs is hereby **GRANTED** and the Debtors are directed to file and serve on the Plaintiff within seven (7) days of the entry of this Order a detailed statement setting forth the attorney's fees and costs they have incurred in this adversary proceeding.

A separate Judgment in favor of the Debtors and against the Plaintiff consistent with these Findings of Fact and Conclusions of Law shall be entered contemporaneously.

Dated this $\underline{23^{rd}}$ day of September, 2008.

ARTHUR B. BRISKMAN
United States Bankruptcy Judge

26